## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| JAMES MURTAGH, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Docket no. 1:12-cv-00160-NT |
| ST. MARY'S REGIONAL HEALTH | ) | |
| CENTER, ST. MARY'S HEALTH | ) | |
| SYSTEM, IRA SHAPIRO, M.D. and | ) | |
| JOHN DOE 1 through 10 and JANE | ) | |
| DOE 1 through 10, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER
## ON MOTION TO DISMISS

This case comes before the Court on Defendants St. Mary's Regional Health Center, St. Mary's Heath System, and Ira Shapiro, M.D.'s ("**Defendants**") motion to dismiss the First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state claims for which relief may be granted (ECF No. 30). For the reasons discussed below, the Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND

Plaintiff James Murtagh, M.D. brought this complaint against the Defendants following a brief stint of employment as a *locum tenens* physician at St. Mary's Regional Health Center (the "**Hospital**"). According to the First Amended Complaint, Murtagh, through Vista Staffing Solutions, Inc. ("**Vista**"), obtained a temporary placement as a pulmonary physician at the Hospital for a term that began on April 22, 2010, and that was supposed to extend at least through July 31, 2010, and possibly blossom into a permanent position. Murtagh claims that, with

the reasonable expectation of an offer of permanent employment, he worked overtime and that he garnered positive and encouraging feedback from management personnel about the quality of his patient care and his relationships with Hospital personnel. But Murtagh was terminated from his position on May 12, 2010, after less than three weeks on the job.

Murtagh alleges that while working for the Hospital he "observed a series of unethical and possibly illegal activities taking place in the Hospital including unnecessary medical procedures and services," First Am. Compl. ¶ 12, and that the conduct "involved patient care and was a condition or practice related to Pulmonary Medicine and Critical Care Medicine that placed the health and safety of patients at risk." First Am. Compl. ¶ 63. He claims that he both reported these potential abuses to the appropriate agencies but also first made disclosures "to the Hospital's Risk Management Offices to provide an opportunity to take corrective action." First Am. Compl. ¶ 63.  Murtagh claims that Shapiro, the Hospital's Chief Medical Officer, somehow became aware of Murtagh's reports and terminated his placement in retaliation for Murtagh's whistleblowing activities. Murtagh also claims that after his employment began, Shapiro learned that Murtagh had been a whistleblower in a previous engagement at Emory University Medical School and that Shapiro preemptively terminated Murtagh's employment in fear that the Hospital's illegal activities would be disclosed by Murtagh.

Following his termination, Murtagh attempted to meet with Shapiro to discuss the Hospital's reasons for his termination but was rebuffed. According to

Murtagh, Shapiro finally responded to Murtagh's queries several days later, explaining only that Murtagh's termination was not a "corrective action," but that he was let go on a "strictly contractual basis." First Am. Compl. ¶ 20. Murtagh alleges that Shapiro then falsely informed Murtagh's other prospective employers and/or medical staffing agencies that Murtagh had been dismissed from the Hospital for unsatisfactory performance. As a result of these false representations, Murtagh claims, Vista discontinued its contractual relationship with Murtagh and he was also "denied several positions for which he had applied and for which he was well qualified by training and experience." First Am. Compl. ¶ 27.

The First Amended Complaint alleges six counts against the Defendants: Count I (breach of contract), Count II (tortious interference with prospective economic advantage), Count III, (defamation and false light), Count IV (enforcement of rights of a third-party beneficiary), Count V (violation of 26 M.R.S.A. § 630) and Count VI (wrongful discharge and retaliation against a whistleblower). The Defendants move to dismiss all counts of the First Amended Complaint.

## LEGAL STANDARD

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and that "[e]ach allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(a)(2) and 8(d)(1). The First Circuit has set forth, consistent with *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the "proper handling of a motion to dismiss" under Rule 12(b)(6):

> Step one: isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements. Step two: take the complaint's well-pled (*i.e.* non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief.

*Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (citations omitted). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job" that requires the Court to "'draw on' its 'judicial experience and common sense.'" *Id.* (quoting *Iqbal*, 129 S.Ct. at 1950).

"Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001) (citing *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir. 1993)). "There is, however, a narrow exception 'for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'" *Id.* (quoting *Watterson*, 987 F.2d at 3). "When the complaint relies upon a document, whose authenticity is not challenged, such a document 'merges into the pleadings' and the court may properly consider it under a Rule 12(b)(6) motion to dismiss." *Alternative Energy,* 267 F.3d at 33 (quoting *Beddall v. State St. Bank & Trust Co.,* 137 F.3d 12, 17 (1st Cir. 1998)).

## DISCUSSION

A. <u>Count I: Breach of Contract</u>

The Defendants claim that the Plaintiff has not adequately alleged the existence of any contract between the Plaintiff and the Hospital that can serve as a basis for his breach of contract claim. The Plaintiff responds: 1) that his placement contract should be integrated with the Hospital's contract with Vista; and 2) that even absent a contract, he is entitled to "some form of due process review regarding his termination" under the Hospital's Bylaws. Pl's Opp'n to Def's Mot. to Dismiss 9 (ECF No. 35).

### 1.   The Agreements

As alleged in the First Amended Complaint, the Plaintiff's breach of contract claim is based on an agreement for *locum tenens* coverage dated March 17, 2008 and signed by the Hospital and Vista (the "**Coverage Agreement**") (ECF No. 22-2).[1] The Plaintiff claims he is a party to this contract, and seeks to enforce both its notice and what he calls its "reasonable findings" requirement. Paragraph 9 of the Coverage Agreement states:

> If Client [defined as the Hospital] reasonably finds the performance of any Professional providing Locum Tenens coverage under this Agreement to be unacceptable for reasons of professional competence or personal conduct, it shall give notice to VISTA and may then remove the Professional from the placement.

The Plaintiff is not a party to the Coverage Agreement. Under Utah law, which governs this agreement (*see* Coverage Agreement ¶ 13(f)), "a meeting of the

---

[1]      The Coverage Agreement was attached as an exhibit to the First Amended Complaint and incorporated therein.

minds on the integral features of an agreement is essential to the formation of a contract." *Nielsen v. Gold's Gym*, 78 P.3d 600, 602 (Utah 2003) (quoting *Richard Barton Enters. v. Tsern,* 928 P.2d 368, 373 (Utah 1996)). The Plaintiff had nothing to do with the creation or terms of this contract, and he was not a signatory to it. Indeed, it was executed by the Hospital and Vista over two years prior to the Plaintiff's placement at the Hospital.

The Plaintiff claims, however, that the Coverage Agreement is part of a larger agreement including a professional services placement agreement executed by the Plaintiff and Vista dated March 11, 2010, (the "**Placement Agreement**") (ECF No. 40-1).[2] Plaintiff alleges that, as a result of the "integration" of these documents, he is entitled to enforce the Coverage Agreement's terms as part of a tri-party contract. This claim is also unavailing.

The Placement Agreement is an agreement signed by Vista and a medical professional who is looking for a temporary assignment. It sets forth certain general terms of the relationship between Vista and the professional that govern all potential assignments going forward. Neither the Coverage Agreement nor the Placement Agreement incorporates the other by reference. By contrast, Paragraph 5 of the Coverage Agreement incorporates by reference certain terms in the professional's Placement Letter.[3] This incorporation of the Placement Letter

---

[2]     This agreement was subsequently added to Murtagh's pleadings by agreement of the parties. *See* Motion to Amend (ECF No. 40), and the Court's order thereon (ECF No. 41). The Court considers this on the motion to dismiss as a document central to Murtagh's claims.

[3]     The Coverage Agreement provides: "Client agrees . . . to provide or pay for the lodging, automobile, and travel expenses of Professional(s), and any costs required by Client's clinics,

demonstrates that, where the parties to the Coverage Agreement intended to incorporate the terms of other agreements, they did so explicitly.

Moreover, the Coverage Agreement contains a merger clause that states:

**Complete Agreement, Amendment**. This Agreement contains the complete understanding between the parties, and shall bind and inure to the benefit of the parties' successors, heirs, and legal representatives. Amendments or variations of the terms of this Agreement shall not be valid unless in writing and signed by all parties.

Coverage Agreement ¶ 13(d). According to Utah's Supreme Court, "the purpose and effect of including a merger clause is to preclude the subsequent introduction of evidence of preliminary negotiations or of side agreements in a proceeding in which a court interprets the document." *Tangren Family Trust v. Tangren*, 182 P.3d 326, 330 (Utah 2008). Where a contract contains an explicit merger clause, evidence extrinsic to the contract can be considered "where the contract is alleged to be a forgery, a joke, a sham, lacking in consideration, or where a contract is voidable for fraud, duress, mistake, or illegality." *Id.* at 330-31. The Plaintiff makes no such claims in this case. Accordingly, absent an explicit incorporation of the Placement Agreement into the Coverage Agreement, the former cannot supplement the terms of the latter, or draw the Hospital into a tri-party contract.

The Plaintiff argues that because Vista is both his agent and the Hospital's agent, Vista acts for him in the Coverage Agreement and for the Hospital in the

---

hospitals or affiliates for credentials verification of Professionals as set forth in each Placement Letter . . . ." Coverage Agreement ¶ 5.

The Placement Letter sets forth the specific terms of an assignment, including the term of the engagement, wages, and reimbursable expenses. *See* ECF No. 38-1 at 8 (sample Placement Letter).

Placement Agreement. From there, the Plaintiff asserts that the "tri-party agreement is directly enforceable" by him. Pl's Opp'n to Def's Mot. to Dismiss 10. The Plaintiff's argument is completely undercut by the Placement Agreement's provision that: "This agreement does not create a partnership or any agency relationship between the parties." Placement Agreement ¶ 19. Plaintiff's citation to *McCarthy v. Azure*, 22 F.3d 351 (1st Cir. 1994) is similarly unhelpful. In *McCarthy*, the First Circuit determined that an individual who signed a purchase agreement only in his official capacity could not invoke the agreement's arbitration clause for claims asserted against him in his individual capacity. The Court fails to see how the *McCarthy* case, which is provided without pinpoint citation, helps the Plaintiff in any way.

The Plaintiff also claims that he was bound by the Coverage Agreement to provide notice to the Hospital in the event he wished to end his relationship with the Hospital, and that he cannot be bound by these terms unless the Hospital is also bound to provide notice to him under this agreement. Murtagh misreads the Coverage Agreement, which does not require him to give notice to the Hospital.[4]

---

[4]      The Coverage Agreement ¶ 7 states:

A Professional identified by a signed Placement Letter may terminate a Placement Letter and cancel a placement if the Professional becomes unable, due to emergency or medical condition, to perform services called for by that Placement Letter. Such Placement Letter may be terminated by Professional or VISTA by giving written notice of termination to Client, identifying the reasons justifying termination. Termination shall be effective on receipt of said notice, and VISTA shall thereafter return any unearned payments received under such Placement Letter. Professional, and not VISTA, is responsible for damages incurred by Client should Professional fail to fulfill or improperly terminate a scheduled placement.

Murtagh's only obligation is under the Placement Agreement, and that obligation is to provide notice to Vista.[5]

Finally, even if the Coverage Agreement and the Placement Agreement were somehow integrated, the Placement Agreement contains essentially the same provision as the Coverage Agreement regarding removal of the Plaintiff from a placement:

> If Client reasonably finds the performance of Professional to be unacceptable for reasons of professional competence or personal conduct, it shall give notice to VISTA and may then remove Professional from the Placement.

Placement Agreement ¶ 4; *see also* Coverage Agreement ¶ 9. Together, these terms unambiguously indicate that any notice rights belong solely to Vista.

### 2.   The Hospital Bylaws

The Plaintiff also makes two breach of contract claims under the Hospital's Bylaws.[6] The Plaintiff asserted in the First Amended Complaint that as a result of his contractual status as a *locum tenens* physician, he was "standing in the shoes of

---

[5]     The Placement Agreement ¶ 4 states:

> The terms of each Placement . . . shall allow Professional to cancel any scheduled placement by giving written notice to VISTA identifying the reasons justifying termination if Professional becomes unable by reason of emergency or medical condition to fulfill an agreed placement. Professional shall pay to VISTA its unrecoverable expenses for any placement canceled by Professional. . . . Except as provided herein or in the applicable Placement Letter, Professional's failure to perform a placement as agreed may result in liability for breach of contract.

[6]     In Maine, "the bylaws of a private medical center may constitute an enforceable contract between the medical center and its staff physicians." *Bartley v. E. Maine Med. Ctr.*, 617 A.2d 1020, 1021 (Me. 1992) (citing *Bhatnagar v. Mid-Maine Medical Ctr.,* 510 A.2d 233, 234 (Me. 1986)); *see also Whalen v. Down E. Cmty. Hosp.*, 980 A.2d 1252, 1254-55 (Me. 2009). Murtagh was not a staff physician, but, on the theory that bylaws may generally *depending on their terms* create enforceable contracts between hospitals and individuals who work there, the Court addresses the substance of the Plaintiff's claims.

a permanent physician" and therefore had a right to a hearing under the Hospital Bylaws regarding discipline and termination of permanent employees. First Am. Compl. ¶ 33.[7] The Plaintiff abandoned this claim, which was prudent since the Bylaws explicitly state that such rights are not available to *locum tenens* physicians.[8]

The Plaintiff falls back on a provision of the Bylaws relating to termination of temporary Hospital privileges:

> The Chief Executive Officer may at any time upon reasonable notice under the circumstances and for any reason after consultation with the Chief Medical Officer of the Medical Staff and the Department Chair terminate any or all temporary privileges granted.

Bylaws Art. 7.5.3. The Plaintiff claims that this provision entitles him to "some form of due process review" regarding his termination. Pl's Opp'n to Def's Mot. to Dismiss 9.

First, the Plaintiff asserts that this paragraph "mandated consultation and agreement amongst the medical staff" and that the Hospital "does not contest" that this consultation and agreement "was not obtained." Pl's Opp'n to Def's Mot. to Dismiss 8. But the First Amended Complaint does not allege that the medical staff failed to consult prior to terminating the Plaintiff's privileges. It asserts that "the Hospital" terminated Murtagh's privileges, an assertion which implies that the termination was attributable to the Hospital and was not the result of some rogue

---

[7]    The Bylaws of the Medical Staff of St. Mary's Regional Hospital were referenced in and attached to the first amended complaint (ECF 22-1) (the "**Bylaws**").

[8]    "No Practitioner shall be entitled to the procedural rights afforded by Article 9 because of his/her inability to obtain temporary privileges or because of any termination or suspension of temporary privileges." Bylaws Art. 7.5.4.

action by one member of the Hospital staff. *See* First Am. Compl. ¶ 15. There is no positive allegation anywhere in the First Amended Complaint that the Hospital's medical staff failed to consult with one another prior to the Plaintiff's termination. The Plaintiff has failed to allege any breach of this provision of the Bylaws.

The Plaintiff also alleges that, after he was notified of the termination of his privileges, he was denied an audience with Shapiro to discuss the reasons why his privileges were terminated and that he was escorted from the premises in a "humiliating fashion." First Am. Compl. ¶ 17. While a *locum tenens* physician may be entitled to "reasonable notice under the circumstances," the Plaintiff's allegations do not support a claim that the notice given to the Plaintiff was unreasonable. The Bylaws do not require the Hospital to provide the Plaintiff with its reasons for termination, nor do they provide contractual protection for any particular manner of escort from the Hospital premises.

For the foregoing reasons, the Plaintiff's claim for breach of contract fails to state a claim for which relief may be granted.

B. <u>Count IV: Enforcement of Rights of a Third-Party Beneficiary</u>

The Plaintiff also claims that he is entitled to enforce the terms of the Coverage Agreement as a third-party beneficiary of this agreement. The Court continues to apply Utah law to this contract-related claim. *See* Coverage Agreement ¶13(f). Utah follows the Restatement (Second) of Contracts § 302 on the question of third-party beneficiaries. *Ron Case Roofing and Asphalt Paving, Inc. v. Blomquist*, 773 P.2d 1382, 1386 (Utah 1989). The Restatement provides:

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

RESTATEMENT (SECOND) OF CONTRACTS § 302. The Coverage Agreement evinces no intent to confer rights on the Plaintiff, and in particular, the contract plainly confers the notice right to Vista alone. But the Plaintiff claims that because he worked for the Hospital, and thereby placed his professional reputation in the Hospital's hands, an intent on Vista's and the Hospital's part to give him some protection should be read into the notice provision. This equitable argument cannot override the actual intentions of the parties, as evidenced by the terms of the Coverage Agreement. Thus, the Plaintiff's claim for enforcement of third-party beneficiary rights fails to state a claim for which relief may be granted.

C. Count II: Tortious Interference with Prospective Economic Advantage

The Defendants claim that the First Amended Complaint fails to state a claim for tortious interference with prospective economic advantage because it fails to adequately allege either fraud or intimidation. Under Maine law:[9]

[t]ortious interference with a prospective economic advantage requires a plaintiff to prove: (1) that a valid contract or prospective economic

_____

[9]     The rest of the Plaintiff's claims are unrelated to either the Plaintiff's contract with Vista or to his claimed rights under Vista's contract with the Hospital, and so are governed by applicable Maine statutory and common law.

> advantage existed; (2) that the defendant interfered with that contract or advantage through fraud or intimidation; and (3) that such interference proximately caused damages.

*Rutland v. Mullen*, 798 A.2d 1104, 1110 (Me. 2002) (footnotes omitted) (citing *James v. MacDonald,* 712 A.2d 1054, 1057 (Me. 1998)).

### 1.   Interference through Fraud

The elements of interference by fraud are:

> (1) mak[ing] a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or refrain from acting in reliance on it, and (5) the other person justifiably relies on the representation as true and acts upon it to the damage of the plaintiff.

*Rutland,* 798 A.2d at 1111. (quoting *Grover v. Minette-Mills, Inc.,* 638 A.2d 712, 716 (Me.1994) (alteration in original) (also citing RESTATEMENT (SECOND) OF TORTS §§ 525-26 (1977)).

To the extent the Plaintiff pleads interference through fraud, he must "state with particularity the circumstances constituting fraud" under Federal Rule of Civil Procedure 9(b). *See Goodman v. President and Trs. of Bowdoin Coll.*, 135 F. Supp. 2d 40, 59 (D. Me. 2001); *cf. Hayduk v. Lanna*, 775 F.2d 441, 443 (1ˢᵗ Cir. 1985) ("Although state law governs the burden of proving fraud at trial, the procedure for pleading fraud in federal courts in all diversity suits is governed by the special pleading requirements of Federal Rule of Civil Procedure 9(b)"). This requires the Plaintiff to be specific about the "time, place, and content of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred." *Hayduk*, 775 F.2d at 444.

The First Amended Complaint alleges that:

> Upon information and belief . . . Shapiro took it upon himself. . . to inform Murtagh's prospective employers and/or medical staffing agencies engaged to assist Murtagh in acquiring other temporary and permanent employment opportunities, that Murtagh had been dismissed from the Hospital for "unsatisfactory performance" despite the fact that no reasonable findings had ever been made or notice issued.

First Am. Compl. ¶ 22. The Plaintiff then alleges that Shapiro's false statements caused Vista to discontinue its contractual relationship with the Plaintiff. Together, these statements get the Plaintiff only partway toward a sufficient claim for tortious interference through fraud. The First Amended Complaint sufficiently alleges what Shapiro said (that the Plaintiff was dismissed for unsatisfactory performance) and to whom Shapiro made the representation (Vista) but it fails to specify when or where Shapiro communicated this to Vista. The First Amended Complaint is also completely deficient in its allegations that Shapiro was responsible for the loss of any additional employment opportunities.[10] Strictly considering the facts alleged in the First Amended Complaint and documents

---

[10]    As part of his opposition to the motion to dismiss, the Plaintiff attached several documents including a copy of a letter dated December 14, 2010 from Shapiro to Community Mercy Health Partners stating that the Plaintiff "was terminated due to unsatisfactory performance" (ECF No. 35-2), and a 29-paragraph statement, (ECF No. 35-4, "**Plaintiff's Additional Statement**"). The statement alleges that a phone call from Shapiro resulted in his termination from a permanent position at the Cleveland University Hospitals in September of 2010, that the Jewish Hospital in Cincinnati terminated him in March of 2011 after receiving a copy of Shapiro's letter, and that Shapiro's letter was responsible for two recruiting companies, Locum Medical and Whitiker Company, refusing to do business with him and also for the inability of a third recruiting company, Alliance, to place him in any positions.

     These additional details cannot be considered on a motion to dismiss. Unlike the contracts and the Hospital Bylaws, the materials providing this information do not fit the "narrow exception" for considering materials outside of the complaint "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiff's claim; or for documents sufficiently referred to in the complaint." *See Alternative Energy, Inc.*, 267 F.3d at 33.

properly incorporated therein, the Plaintiff's claim fails to state a claim for tortious interference through fraud.

### 2.   Interference through Intimidation

The Plaintiff asserts that he has stated a claim for interference through intimidation. *See Currie v. Indus. Sec., Inc.*, 915 A.2d 400, 408 (Me. 2007). In *Currie*, Maine's Law Court observed:

> "intimidation is not restricted to 'frightening a person for coercive purposes,'" but rather exists wherever a defendant has procured a breach of contract by "making it clear" to the party with which the plaintiff had contracted that the only manner in which that party could avail itself of a particular benefit of working with defendant would be to breach its contract with plaintiff.

*Currie*, 915 A.2d at 408 (quoting *Pombriant v. Blue Cross/Blue Shield of Maine*, 562 A.2d 656, 659 (Me. 1989)). The First Amended Complaint does not allege that Shapiro "made it clear" to Vista that Vista could only continue its relationship with the Hospital if Vista discontinued its relationship with the Plaintiff. It alleges only that Shapiro falsely informed Vista of the Plaintiff's unsatisfactory performance and that, based on this report, Vista dropped the Plaintiff. Accordingly, the First Amended Complaint fails to state a claim for tortious interference with prospective economic advantage through intimidation.

### D.   Count III: Defamation

The Defendants contend that the First Amended Complaint fails to state a claim for defamation because Shapiro's alleged statements that the Plaintiff was terminated for unsatisfactory performance were not false or defamatory. Common law defamation consists of:

(a) a false and defamatory statement concerning another;
(b) an unprivileged publication to a third party;
(c) fault amounting at least to negligence on the part of the publisher; and
(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991) (quoting RESTATEMENT (SECOND) OF TORTS § 558 (1977)). Under Maine law:

> The plaintiff in a defamation case must prove that the published statements made were defamatory, meaning that the statements harmed his reputation so as "to lower him in the estimation of the community." *Schoff v. York Cnty*, 761 A.2d 869, 871 n. 3 (Me. 2000) Moreover, the plaintiff must prove that the defamatory statements are false. . . . A false statement must be "an assertion of fact, either explicit or implied, and not merely an opinion, provided the opinion does not imply the existence of undisclosed defamatory facts." *Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991). If the publication is truly an opinion . . . it is not actionable. . . .
>
> "The determination whether an allegedly defamatory statement is a statement of fact or opinion is a question of law . . . [but if] the average reader could reasonably understand the statement as either fact or opinion, the question of which it is will be submitted to the [fact-finder]." *Caron v. Bangor Publ'g Co.*, 470 A.2d 782, 784 (Me. 1984).

*Ballard v. Wagner*, 877 A.2d 1083, 1087 (Me. 2005) (alterations in original) (some citations omitted).

Taking all reasonable inferences in the Plaintiff's favor, Shapiro's alleged statement that the Plaintiff was terminated due to unsatisfactory performance implies the existence of undisclosed defamatory facts. A fact finder could reasonably find that someone receiving this statement from Shapiro would understand it to mean that the Hospital found that the Plaintiff failed to meet certain objective professional standards when he worked there. A fact finder could reasonably find

that this statement harmed the Plaintiff's professional reputation and lowered him in the estimation of the community. *See Stanton v. Metro Corp.*, 438 F.3d 119, 124-25 (1st Cir. 2006) (under Massachusetts law, on a motion to dismiss court determines not the ultimate issue of whether the statement is defamatory, but the threshold question of whether the statement is reasonably susceptible of a defamatory meaning.) The Plaintiff also adequately alleged that his performance while at the Hospital was not deficient in any respect, and thus, that this statement was false. The First Amended Complaint states a claim for defamation.

   E.   Count III: False Light

The Defendants claim that the Plaintiff fails to plead that the Defendants gave publicity to any matter that placed him in a false light. The tort of false light, also known as "false light invasion of privacy," "is based on publicity which places the plaintiff in a false light in the public eye." *Cole v. Chandler*, 752 A.2d 1189, 1197 (Me. 2004). Under the Restatement (Second) of Torts, which Maine follows, liability for false light is described as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

RESTATEMENT (SECOND) OF TORTS § 652E (1977), *see Chandler*, 752 A.2d at 1197. The Restatement also explains the following regarding publicity:

> "Publicity," as it is used in this Section, differs from "publication," as that term is used in § 577 in connection with liability for defamation. "Publication," in that sense, is a word of art, which includes any communication by the defendant to a third person. "Publicity," on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.

RESTATEMENT (SECOND) OF TORTS § 652D cmt. a (1977).

The First Amended Complaint makes no claim that Shapiro gave publicity to the matter of the Plaintiff's termination from the Hospital. It claims only that Shapiro took it upon himself to inform the Plaintiff's prospective employers and/or medical staffing agencies that the Plaintiff had been dismissed from the Hospital for unsatisfactory performance. The Plaintiff's Additional Statement gets closer to the idea of publicity when it asserts that Shapiro's letter was in a central database to which all Mercy hospitals have access, and that as a result of the letter, the Plaintiff could not be hired in a Catholic hospital anywhere in the nation. But again, the Court will not consider this information because it was not presented within the operative pleading. *See Alternative Energy, Inc.*, 267 F.3d at 33. The Plaintiff's claim for false light, as alleged in the First Amended Complaint, must be dismissed.

F.   Count V: Violation of 26 M.R.S.A. § 630

The Defendants move to dismiss the Plaintiff's statutory claim for a written explanation of the Hospital's reasons for terminating his employment. Under Maine's employment practices statutes, "[a]n employer shall, upon written request of the affected employee, give that employee the written reasons for the termination

of that person's employment." 26 M.R.S.A. § 630. "Employee" is defined under these statutes as "every person who may be permitted, required or directed by any employer in consideration of direct or indirect gain or profit, to engage in any employment," 26 M.R.S.A. § 591.[11]

The Defendants assert that the Plaintiff cannot make out a claim under § 630 because he was an independent contractor, both under the terms of the Placement Agreement and by his own admission in the First Amended Complaint. *See* Placement Agreement ¶ 11, First Am. Comp. ¶¶ 31, 39, 53, and 57. The Plaintiff argues that the question of whether he was an employee or an independent contractor is a factual matter not appropriate for determination on a motion to dismiss. The Court agrees with the Plaintiff. The multi-part test for determining the status of an individual as an independent contract is fact-intensive.[12]

Regarding the Placement Agreement terms, Maine has long held that these are not determinative of an individual's status as an employee or independent contractor. *See, e.g., Timberlake v. Frigon & Frigon*, 438 A.2d 1294, 1298 (Me. 1982) ("one might 'intend to enter into an independent contractual relationship and still the terms of the employment be such that the law would determine his status as

---

[11] Under a recently-passed law, "An Act to Standardize the Definition of 'Independent Contractor,'" "employee" has explicitly been defined in contradistinction to "independent contractor." *See* 2012 Me. Legis. Serv. Ch. 643 (H.P. 960) (L.D. 1314) (West). The Plaintiff does not claim that this law, which went into effect on December 31, 2012, is inapplicable to his case. Even before the law went into effect, the definition of "employee" was largely considered to be in contradistinction to "independent contractor." *See North East Ins. Co. v. Soucy,* 693 A.2d 1141, 1144 (Me. 1997). ("definition of employment status almost always takes the form of distinguishing an employee from an independent contractor.").

[12] *See* 26 M.R.S.A. § 1043(11)(E). The 2012 amendment to 26 M.R.S.A. § 591 incorporates this definition of "independent contractor".

that of an employee. . . .'" (quoting *Kirk v. Yarmouth Lime Co.*, 15 A.2d 184, 187 (Me. 1940)).

Regarding the Plaintiff's assertions of independent contractor status in the First Amended Complaint, Federal Rule of Civil Procedure 8(d) allows a plaintiff to make inconsistent claims: "A party may state as many separate claims or defenses as it has, regardless of consistency." This is essentially what the Plaintiff has done in paragraph 57 of the First Amended Complaint, which states, "Although an independent contractor, Murtagh is also an 'employee' as to the Defendant Hospital within the Meaning of Title 26, Section 630." Although the Plaintiff apparently did not understand that the terms "employee" and "independent contractor" are mutually exclusive under Maine law, his assertion of independent contractor status may not be borne out by the evidence, and his assertion that he was an employee of the Hospital may yet prove viable. The First Amended Complaint raises sufficient factual questions regarding the Plaintiff's status as an independent contractor that, resolving all doubts in the Plaintiff's favor, a sufficient claim of employee status has been made.

### G. Count VI: Retaliation Against a Whistleblower and Wrongful Discharge

The Defendants move, finally, to dismiss Count VI of the First Amended Complaint, which alleges a claim for retaliation and wrongful discharge in violation of Maine's Whistleblower Protection Act, 26 M.R.S.A. § 833 (the "**WPA**"). In Count VI, the Plaintiff alleges that he was wrongfully terminated from his position at the Hospital either because: (1) Shapiro perceived him as a whistleblower based on the

Plaintiff's past whistleblowing activities; or (2) Shapiro actually discovered the Plaintiff's whistleblowing with regard to the Hospital.

*Costain v. Sunbury Primary Care, P.A.*, 954 A.2d 1051 (Me. 2008) sets forth the basic test:

> There are three elements to a claim of unlawful retaliation: (1) the employee engaged in activity protected by the statute; (2) the employee was the subject of an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action.

*Costain*, 954 A.2d at 1053 (citing *Blake v. State*, 868 A.2d 234, 237 (Me. 2005)). The Defendants claim that the Plaintiff's claim fails to adequately allege either that the Plaintiff engaged in protected activity or that there was a causal link between the protected activity and the adverse employment action taken against him.

### 1.   Engagement in a Protected Activity

#### a.   *Perceived Whistleblower*

The Plaintiff's first theory—that his employment was illegally terminated because he was perceived as a whistleblower from prior whistleblower activity at a previous employer—cannot be sustained under the text of WPA or the case law interpreting it. The statute protects only employees who have actually taken some action in regard to their current employer, whether reporting potentially illegal or injurious activities, participating in an investigation or hearing, or refusing to carry out the employer's directive to engage in illegal or injurious activities. *See* 26 M.R.S.A. § 833(1), *cf. Chandler v. Dowell Schlumberger Inc.*, 572 N.W.2d 210, 212 (Mich. 1998) (construing its WPA, which protects an employee who "reports *or is about to report* . . . a suspected violation" (emphasis added)).

The Law Court has also interpreted the WPA to protect only "(1) employees (2) who report to an employer (3) about a violation (4) committed or practiced by that employer." *Costain*, 954 A.2d at 1054. In *Costain*, the state had asked the plaintiff to participate in a licensing board's investigation against a doctor who worked at a medical practice where she was a patient. *Id.* at 1052. A few years later, the plaintiff began working for the practice as a rehabilitation aide, but, several weeks into her new job, her employment was terminated after the practice learned that she had, years prior, participated in the investigation of the doctor. *Id.* Even though the plaintiff's actions plainly met the criterion of being "requested to participate in an investigation, hearing or inquiry held by that public body" under § 833(1)(C), the Law Court found that she was not protected under the WPA because she was not an employee of the defendant at the time of the investigation. *Id.* at 1054. Similarly here, the Plaintiff is not protected by the WPA for blowing the whistle on another employer prior to his engagement by the Hospital. Neither the Plaintiff's status as a former whistleblower, nor Shapiro's alleged fear that the Plaintiff might blow the whistle, is enough to confer protected status on the Plaintiff.

### b. *Actual Whistleblower*

The Plaintiff also claims that he was actually engaged in whistleblowing against the Hospital at the time his employment was terminated. Paragraph 63 of the First Amended Complaint states:

> Murtagh reported possible illegal or fraudulent activity taking place at St. Mary's in good faith to state and federal agencies and to

> Defendants. Specifically, the conduct involved patient care and was a condition or practice related to Pulmonary Medicine and Critical Care Medicine that placed the health and safety of patients at risk. The disclosures were made first to the Hospital's Risk Management Offices to provide an opportunity to take corrective action and then to VISTA and other agencies.

There are no further details regard the Plaintiff's alleged reporting in the First Amended Complaint. This paragraph is insufficient under *Iqbal* and *Twombly* and their progeny to state a plausible claim that the Plaintiff was actually engaged in whistleblowing. It is almost entirely an empty recitation of statutory criteria without underlying factual content. The only part of the paragraph that provides factual content is the Plaintiff's allegation that he made disclosures to the Hospital's Risk Management Office, which at least identifies a particular office within the Hospital to which the Plaintiff made reports. The Court can plausibly infer from the title of this office that the disclosures were made to "a person having supervisory authority with the employer" as required by § 833(2).

The content of the alleged disclosures and when they were made, however, remain shrouded in mystery. That the conduct involved "patient care" means nothing. The statute recites that the report of "a deviation from the applicable standard of care for a patient" is protected activity. 26 M.R.S.A. § 833(1)(E). That the conduct "was a condition or practice related to Pulmonary Medicine and Critical Care Medicine that placed the health and safety of patients at risk" is similarly meaningless. The statute recites that the report of "a condition or practice that would put at risk the health or safety of that employee or any other individual" is protected activity. 26 M.R.S.A. § 833(1)(B). The phrase "related to Pulmonary

Medicine and Critical Care Medicine" simply inserts into the legal standard those areas of practice in which the Plaintiff was engaged without providing any content about the alleged violations. The Plaintiff introduces additional facts in the Plaintiff's Additional Statement, but as noted above, the Court cannot consider this exhibit on the motion to dismiss. For these reasons, the First Amended Complaint fails to adequately allege that the Plaintiff was engaged in the protected activity required to state a claim for unlawful termination and retaliation under the WPA.

### 2. Causation

Since the Plaintiff has not articulated a plausible claim that he engaged in protected conduct, it follows by force of logic that he has not articulated a plausible claim that his employment was terminated because he engaged in protected conduct. The Court need not go on to assess the complaint's allegations on causation.

### **CONCLUSION**

For the reasons stated, the Defendant's motion to dismiss is **DENIED** as to Counts III and V for defamation and violation of 26 M.R.S.A. § 630, and **GRANTED** as to Counts I, II, III, IV, and VI for breach of contract, tortious interference with prospective economic advantage, false light, and enforcement of rights of third-party

beneficiary, and wrongful discharge and retaliation against a whistleblower. Count III survives as to defamation but not false light. Counts I, II, IV, and VI are hereby **DISMISSED**.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 23rd day of September, 2013.